1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLORADO

3  Case No. 12-cr-00010-MSK

4  ────────────────────────────────────────────────────

5  UNITED STATES OF AMERICA,

6      Plaintiff,

7  vs.

8  DELBERT GARDNER,

9      Defendant.

10 ────────────────────────────────────────────────────

11      Proceedings before KATHLEEN M. TAFOYA, United

12 States Magistrate Judge, United States District Court for

13 the District of Colorado, commencing at 2:18 p.m., January

14 31, 2012, in the United States Courthouse, Denver, Colorado.

15 ────────────────────────────────────────────────────

16      WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17 ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18 ────────────────────────────────────────────────────

19                    APPEARANCES

20      GUY TILL, Assistant United States Attorney,

21 appearing for the government.

22      SCOTT JURDEM, Attorney at Law, appearing for the

23 defendant.

24 ────────────────────────────────────────────────────

25              ARRAIGNMENT/DISCOVERY/DETENTION HEARING

1                    P R O C E E D I N G S

2                    (Whereupon, the within electronically recorded

3          proceedings are herein transcribed, pursuant to order of

4          counsel.)

5                    THE CLERK: All rise.  Court is now in session.

6                    THE COURT: Good afternoon, everyone, please be

7          seated.

8                    We have several matters coming before the Court

9          today.  The first is 12-cr-10.  Well, I think -- excuse me,

10         they're all in Case No. 12-cr-10, but we have several

11         separate matters to consider, the first is United States of

12         America versus Delbert Gardner.  May I have appearances.

13                   MR. TILL: Your Honor, I'm Guy Till, I'm an

14         Assistant U.S. Attorney representing the government.

15                   MR. JURDEM: Good afternoon, Your Honor.  For the

16         record, I'm Scott Jurdem.  I am appointed to represent Mr.

17         Gardner, he's present in custody.

18                   THE COURT: All right.

19                   MR. JURDEM: I'll just tell the Court, perhaps it's

20         curious, this is Thea Reiff.  Ms. Reiff is attorney in my

21         office.

22                   THE COURT: All right.  Reef, R-E-E-F?

23                   MR. JURDEM: Actually, it's Reiff, R-E-I-F-F.

24                   THE COURT: All right.  Well, welcome to court

25         today.

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

3

1          We're here today in Mr. Gardner's case for an

2     arraignment, a discovery conference, and a detention

3     hearing.  We tried to hold these yesterday, but Mr. Jurdem

4     apparently hadn't been contacted yet on this case.  So are

5     you prepared to go forward with arraignment in this matter?

6          MR. JURDEM: Yes.

7          THE COURT: Do you need to have the Indictment read

8     to you?

9          MR. JURDEM: No, Your Honor, we would waive the

10    reading of the Indictment, we'd waive any further advisement

11    on it, and enter a plea -- or a plea of not guilty to the

12    two counts he's charged in.

13         THE COURT: All right.

14         MR. JURDEM: And any other applicable counts.

15         THE COURT: All right, the pleas of not guilty will

16    be entered to all counts in which Mr. Gardner is charged.

17    I do have the discovery conference memorandum in front of

18    me, let me give you the speedy trial dates.  The 30-day date

19    is February the 24th, 2012, the 70-day date is April 4th,

20    2012, and the 90-day date, if needed, is April 24th, 2012.

21         I understand that discovery will start to be

22    provided on February the 6th of 2012.  Is that right, Mr.

23    Till?

24         MR. TILL: Yes, Your Honor.

25         THE COURT: And then reciprocal discovery by

1    defendant.  What date shall I put in here?

2                MR.  JURDEM:  Put  in  the  --  if  the  Court  is

3    comfortable with March 6th, because I understand that we're

4    not going to have a whole lot on February 6th.  Not that

5    it's Mr. Till's fault, but apparently there were a number of

6    searches on January 20th and lots of things to be organized.

7                THE COURT: All right, we'll put in March 6th.

8                You're really going to be controlled by the dates

9    that are given to you by Judge Krieger --

10               MR. JURDEM: I understand that.

11               THE COURT: -- in any event.  So I think there are

12   some dates that have already been set.  Are you aware of

13   those dates, Mr. Jurdem?

14               MR. JURDEM: Yes, Your Honor, we printed the order

15   off yesterday after we got appointed.

16               THE COURT: All right.  All right.  I've signed the

17   discovery order then.

18               So  what's  left  is  the  issue  of  bond  for  Mr.

19   Gardner.  What's the government's position?

20               MR. TILL: Your Honor, we are asking to detain Mr.

21   Gardner without bond.

22               THE COURT: All right.

23               And what's the defendant's position?

24               MR. JURDEM: Your Honor, our position is that Mr.

25   Gardner is 31 years old, he's never been convicted of a

1   felony, he's been from Oklahoma, and eventually Colorado,

2   his entire life.  He is -- the substantive charge that he's

3   facing is possession with supposed intent to distribute less

4   -- somewhat less than 28 grams of crack, I don't know how

5   much, but certainly not very much or they would have charged

6   more.  He is charged with -- the only other count is 32,

7   this clubhouse count, yet he has never been to the clubhouse

8   and has no involvement at all with this Hell's Lovers group.

9   He has no tattoos, he has no indicia of being a member of

10  the group, and it is -- it seems like it would be tremendous

11  overkill to keep him in custody until trial.

12          I know the Court is very familiar with cases in

13  which there are very, very large amounts of drugs and guns

14  and very dangerous people, and I think you can see just from

15  the fact that he's charged with less than 28 grams and

16  simply one of 16 people who supposedly used the clubhouse,

17  which we're maintaining he was never at, that he does not

18  fit in the group of people that the Court generally holds

19  without bond.

20          I recognize --

21          THE COURT: Well, let me stop you for just a

22  second, because if you're contesting detention and arguing

23  for bond, which I believe is what you're doing --

24          MR. JURDEM: That's what I'm doing.

25          THE COURT: -- I think the government has a right,

1      first, to present its evidence --

2                 MR. JURDEM: I --

3                 THE COURT: -- so we'll see how we want to take it

4      up.

5                 Do you have any witnesses you want to call, Mr.

6      Till?

7                 MR. TILL: No, Your Honor, I don't want to call any

8      witnesses.

9                 THE COURT: All right.  So you want to proceed by

10     proffer or just argument?

11                MR. TILL: I suppose a little bit of proffer and

12     argument.

13                THE COURT: All right.  And so is it acceptable

14     that Mr. Jurdem go ahead and make his argument --

15                MR. TILL: Sure.  Yes, Your Honor.

16                THE COURT: -- and then you can.

17                All right, go ahead.

18                MR. JURDEM: Well, Your Honor, I'd like to call the

19     case agent.

20                THE COURT: You'd like to do what?

21                MR. JURDEM: To call the case agent to the witness

22     stand.

23                THE COURT: All right.  If you're going to call a

24     witness, then let me ask the government first.  Are you

25     going to call witnesses, you said no?

1              MR. TILL: No, Your Honor.

2              THE COURT: All right.  Go ahead and call your

3     witness then.

4              MR. JURDEM: All right.  Would you please take the

5     witness stand.

6                   JASON COLE, GOVERNMENT WITNESS, SWORN

7              THE COURT: Please state your full name for the

8     record and spell your last name for the record.

9              THE WITNESS: My name is Jason Cole, my last name

10    is spelled C-O-L-E.

11             THE COURT: You may proceed.

12             MR. JURDEM: Thank you, Your Honor.

13                   DIRECT EXAMINATION

14    BY MR. JURDEM:

15    Q     Good afternoon, Agent Cole.

16    A     Good afternoon.

17    Q     How are you employed, sir?

18    A     I am a Special Agent with the Bureau of Alcohol,

19    Tobacco, Firearms & Explosives.

20    Q     And how long have you been so employed?

21    A     Approximately four years.

22    Q     And what are your duties with Alcohol, Tobacco &

23    Firearms?

24    A     Well, I am currently assigned to a group that is

25    responsible for investigating violent crime, specifically

1   firearms and drug trafficking in the Denver metro area.

2   Q   And what's the name of the group?

3   A   Denver Group One.

4   Q   All right.  And in your capacity as a law enforcement
5   officer, what, if any, role did you have in the
6   investigation that led to the Indictment in this case which
7   includes my client Delbert Gardner?

8   A   I'm the primary case agent, and the case specifically
9   focused on in targeting members and associates of the Hell's
10  Lovers Motorcycle Club, and our case primarily focused in
11  Denver, Colorado.

12  Q   And Agent Cole, when did you begin your investigation
13  into the Hell's Lovers Motorcycle Club?

14  A   Approximately December 30th, 2008.

15  Q   And what caused you to commence the investigation of
16  this group?

17  A   We had a confidential informant who began providing
18  information related to the organization, members and
19  associates of the organization.  Based upon his information
20  and our preliminary investigation, we decided to open the
21  case.

22  Q   All right.  And when you opened the case, did you begin
23  to identify people that were targets of interest in the
24  investigation?

25  A   Yes.

1    Q     And can you tell the Court how the investigation

2    developed in terms of who these people were that initially

3    came to your attention as targets of interest.

4    A     Well, as I said, we had an informant who came to us

5    and began providing us information, and, as I said, it was

6    initially it was members and associates of this motorcycle

7    organization.  As we began looking at those, I think in all

8    in  this  investigation  I've  identified  or  partially

9    identified over 150 individuals.  We fully identified about

10   a hundred individuals, and it was through that and through

11   our investigation of the club and specific individuals that

12   we went about doing that.

13   Q     Did you become familiar with the identity of the

14   officers or primary players in the Hell's Lovers Motorcycle

15   Club?

16   A     Yes.

17   Q     Who were they?

18   A     They've been different at various times.

19   Q     Of the 16 people in this Indictment, could you identify

20   for the Court any or all of them that were officers or what

21   you  could  call  perhaps  directors  of  the  Hell's  Lovers

22   Motorcycle Club.

23   A     Yes, Corey Riley for a majority of our investigation

24   was  the  regional  president  of  the  organization.   Calvin

25   Riley and Corey Riley as well are formerly presidents of the

1     Colorado chapter of the Hell's Lovers Motorcycle Club.

2     Lawrence Martin is a former president of the Hell's Lovers

3     Motorcycle Club.  Johnie Myers is the current vice president

4     of the Colorado chapter, the long-time treasurer of the

5     Colorado chapter.  Gregory Collins is a member of the

6     national board of the Hell's Lovers Motorcycle Club.  Thomas

7     Schrah is the secretary of the club.  Richard Johnson is the

8     self-described enforcer of the club.

9     Q    Anyone else?

10     A    Off the top of my head, I can't think of anybody else.

11     Q    Is George Askew, does he have that role?

12     A    No.

13     Q    And what about Romell Bullock?

14     A    He's a member, he does not have a specific leadership.

15     Q    And how do you know Romell Bullock is a member of the

16     Hell's Lovers Motorcycle Club?

17     A    He's been identified by multiple informants as well

18     as by an undercover agent.

19     Q    Do these members have some kind of identifying markings

20     on them?  For example, tattoos?

21     A    Some of them do.

22     Q    All right.  Do they say -- what do they say?

23     A    The tattoo?

24     Q    Yes.

25     A    The tattoo is given to individuals once they have

1    become what's called a christened member, which means a

2    full-fledged (inaudible).   You wouldn't get that tattoo

3    until approximately four to five years of association and

4    prospecting and probationary membership with the club, so a

5    large number of people, just so you understand, don't have

6    that tattoo that are members and associates of this club,

7    but once you became what's called a christened member of the

8    club, which, you know, in other motorcycle clubs would be

9    referred to maybe as a full patched member, you get a tattoo

10   on your -- typically on your right forearm.   The tattoo is

11   the logo of the Hell's Lovers Motorcycle Club.   Above the

12   logo it says Hell's Lovers.   Below the logo it generally

13   gives the state in which the person became a full member and

14   the year that they were christened.

15   Q    All right.   And the individuals you -- well, let me ask

16   you this.   Do you know if Romell Bullock -- you mentioned

17   was a member.   Does he have a tattoo?

18   A    Yes.

19   Q    All right.   And I assume Gregory Collins has a tattoo.

20   A    Yes.

21   Q    Richard Johnson.

22   A    Yes.

23   Q    Lawrence Martin.

24   A    Yes.

25   Q    Johnie Meyers.

1     A     Yes.

2     Q     Darrell Parker.

3     A     Darrell Parker does not have a tattoo.

4     Q     Okay.  What was his role, again?

5     A     He was a prospect and probationary member of the Hell's

6     Lovers Motorcycle Club over the last few years.

7     Q     All right.  Calvin Riley has a tattoo?

8     A     Yes.

9     Q     Corey Riley?

10    A     Yes.

11    Q     Thomas Schrah?

12    A     Yes.

13    Q     Now, what is George Gaddy's role?

14    A     George Gaddy is a retired member of the club.

15    Q     Does he have a tattoo?

16    A     Yes.

17    Q     And what about Sheps Khamsahu, what's his role?

18    A     He -- sorry if I've left him out.  He is the current

19    regional president of the motorcycle club, and over the past

20    several years was the vice president of the club.

21    Q     All right, so he has a tattoo?

22    A     Yes.

23    Q     And what about Eric Lugo, what's his role?

24    A     Eric Lugo is not a member of the club.

25    Q     Okay.  And what about James Switzer?

1    A    He is no longer a member of the club.

2    Q    He was at one time?

3    A    He as a prospect or a probationary member of the club.

4    Q    All right.  And what about Clifford Wright?

5    A    Clifford Wright is not a member of the club.

6    Q    All right.  So of the 16 named people in the

7    Indictment, 13 would either be members or prospective

8    members, probationary members, former members?

9    A    I believe that's probably pretty close to accurate.

10   Q    All right.  Now, in addition to wearing -- excuse me,

11   having these tattoos, do these club members wear identifying

12   clothing?

13             MR. TILL: Your Honor, I'd like to object to this

14   line of questioning.  I really don't think it goes to the

15   issue before the Court this afternoon of detention.   It

16   seems to me that counsel is simply trying to learn about the

17   culture of the motorcycle club.  I don't really think that

18   it's sufficiently relevant.

19             MR. JURDEM: Your Honor, my --

20             THE  COURT:  I  understand  the  tattoos,  I  don't

21   understand the clothing.

22             MR. JURDEM: Okay.  Well, my position would be

23   under 3142, Section G, 1 and 2, particularly 2, the weight

24   of the evidence against the person, that he -- one of the

25   two counts in the case is that he's charged with using and

1       being involved in this motorcycle gang clubhouse, and I

2       would expect that people, you know, from watching TV, Hell's

3       Angels and the like wear jackets and vests with markings on

4       them, and so if someone is charged with being part of this

5       group, and I recognize the charge is not being part of the

6       group, but one of the two main -- the only other count in

7       the case is that he is involved with these people at the

8       clubhouse, and so if they all wear jackets and uniforms

9       consistent with membership and belonging at the clubhouse

10      and he doesn't, I think that would go to the issue of the

11      weight of evidence, and I actually, in this case, more than

12      others, I recognize Mr. Till's point, this is not just to

13      gather discovery, but he's seeking to hold my client without

14      bond on charges that are -- once again, obviously they're

15      very serious, I'm not trying to make light of them, but it's

16      not like having, you know, over 280 grams of crack or guns

17      or large quantities or meth or something like that, we're

18      talking about under 28 grams of crack and hanging out at

19      this place.

20             So I think that the weight of the evidence in this

21      hearing is something that's perhaps more important for the

22      Court to hear what kind of person my client is and what kind

23      the evidence they have against him when you make the

24      decision whether you want to hold him without bond.

25             THE COURT: Well, I'll give you some leeway for

1   some of these general questions, but don't go through every

2   single other defendant asking what they wear --

3            MR. JURDEM: I won't.

4            THE COURT: -- everyday.

5            MR. JURDEM: I won't.

6            THE COURT: I mean, that's going to make this too

7   long, number one.

8            MR. JURDEM: Okay.

9            THE COURT: Number two, I don't think it's very

10   relevant because there's an Indictment that's been handed

11   down against your client so a grand jury has already found

12   probable cause against him to hold him, so I think the

13   weight of the evidence becomes a little less meaningful than

14   if you were here on a complaint.

15            MR.   JURDEM:   Your   Honor,   I   will   limit   my

16   questioning.

17            THE COURT: All right.

18   Q    (By Mr. Jurdem) Do the members of the organization

19   generally wear any type of garb?

20   A    Yes.

21   Q    And what?  What is that, jackets, vests?

22   A    Well, they have what's described as a uniform when

23   they're present at the clubhouse that signifies them as

24   being members, which would differentiate them from civilians

25   that are at the clubhouse because the clubhouse is often

1   used as an after-hour bar location, so there's a lot of

2   people that come in that are members and they want to

3   differentiate themselves.

4        One of the things that they have is the black

5   leather vests commonly thought of as being associated with

6   motorcycle organizations.   It involves a -- you know, is

7   most recognizable probably with the three-piece patch on the

8   back which identifies the club by name, has the logo, and

9   the specific region therein.   And then members would be

10  required to wear all black clothing to the thing.   Now,

11  civilians, as they would call them, who are non-members,

12  associates or whatever, if they were attending a club

13  function would not be required to wear all black, or

14  certainly would not wear the vest that identifies the

15  members.

16  Q    All right.  And out of respect for the Court, let me

17  just cut to the chase.  Do you have any reason to believe

18  that Delbert Gardner is a member of the Hell's Lovers

19  Motorcycle Club?

20  A    Not a member, no.

21  Q    He has no tattoos?

22  A    No, but as I said, that doesn't necessarily mean that

23  you have membership or not, but --

24  Q    I'm just trying to establish what the evidence is.  He

25  has no tattoos.

1    A    None that I'm aware of.

2    Q    All right.  And he has not been seen wearing any of the

3    Hell's Lovers Motorcycle Club garb, has he?

4    A    No.

5    Q    What evidence is there in this case that he has ever

6    been physically present at the Hell's Lovers Motorcycle Club

7    clubhouse?

8    A    Information provided to us by an informant who proved

9    to be reliable.

10   Q    All right.  Is there any law enforcement officer that

11   has even seen my client at the Hell's Lovers Motorcycle Club

12   clubhouse?

13   A    No.

14   Q    Would it be fair then, so that the Court can

15   understand, the only evidence that exists of my client ever

16   being present at the Hell's Lovers Motorcycle Club clubhouse

17   is the word of one confidential informant?

18   A    Not entirely.  Now, the information came to us from one

19   informant, but we've also had others identify your client by

20   moniker.

21   Q    What -- yeah, and again, I'm just trying to find out

22   what the evidence is so that I can move this along.  What --

23   when you say identify by moniker, what do you mean?

24   A    I mean that people don't always know everybody's real

25   name, so your client was known to people as Blade, and he

1    was -- he was identified to us by that name.

2    Q    Blade, B-L-A-D-E?

3    A    That's how I would spell it.

4    Q    And so your evidence that he has been present at that

5    clubhouse is one confidential informant told you that and

6    that it's been corroborated by some other people saying that

7    someone known as Blade had been at the clubhouse.

8    A    And identified through photographs.

9    Q    Okay.  So are those people that have identified a

10   photograph of my client as my client being present at this

11   clubhouse, are they members of the indicted group of the 16

12   people?

13   A    I'm sorry, restate the question.

14   Q    Who identified my client, other than the confidential

15   informant, who identified a photograph of my client and said

16   he was at the clubhouse?

17   A    Other confidential informants.

18   Q    Okay.  So not other co-defendants in the case?

19   A    No.

20   Q    Were these people that said my client was at the

21   clubhouse, were they members of the club?

22   A    Some of them.

23   Q    How many are there?

24   A    How many what?

25   Q    How many people said my client was at the club?

1    Q    Sir, without being able to look back over all of my

2    notes, I can't -- I can't say off the top of my head.  I

3    would say probably at least two people identified him.

4    Q    Okay.  So you took a photograph of my client, showed it

5    to two informants who remain unidentified, and they pointed

6    at his picture and said I've seen him at the club?

7    A    They've identified who he is, yes.

8    Q    I don't understand what you mean.  Have they said he's

9    been at the club or have they not?

10   A    I guess I don't entirely understand your line of

11   questioning, sir.  What I'm saying is that I don't know that

12   I ever specifically asked where they knew him from.  My --

13   my questions to them were related specifically to the Hell's

14   Lovers Motorcycle Club and who they knew from that list.  He

15   was identified as being somebody that was known to them, so

16   I don't know specifically that I said did he frequent the

17   Hell's Lovers Motorcycle Club clubhouse, how often did he

18   frequent it, or any of those questions.  He was identified

19   to me as somebody who was known to these people, and -- and

20   through their association with this motorcycle club.

21   Q    Okay.  But they never told you that he used the

22   clubhouse?  You don't remember?

23   A    No, sir.  I guess I'm confused by the question because

24   there's -- I think there could be multiple ways that -- that

25   you can interpret the word "used the clubhouse."

1        Q    Well, he's charged with knowingly maintaining and using

2    the premises known as the Hell's Lovers Motorcycle Club

3    clubhouse, so I'm just asking you who told you that he used

4    the Hell's Lovers Motorcycle Club clubhouse, if anyone?

5        A    I've already -- I thought I already answered that

6    question.  I've had two different people tell me that they

7    know of him and that their knowledge of him is because of

8    this club.

9        Q    Okay.  But they don't know whether he actually used the

10   clubhouse or maybe he was hanging out with the guys in a gas

11   station somewhere?

12       A    I can't speak to specific dates or any of those things.

13       Q    All right.  So you, as we sit here today, are unaware

14   of any evidence that he ever in fact used the clubhouse

15   other than the fact that two people said he was associated

16   with this group in some way.

17       A    I suppose -- I suppose that -- that that's true.

18       Q    All right.  Now, when did Mr. Gardner come to your

19   attention?  You mentioned that you began this investigation

20   on December 3rd.  Excuse me, 30th, 2008.

21       A    He came to our attention in probably early, mid spring

22   of 2009.

23       Q    And how did that occur?

24       A    Through our informant at the time.

25       Q    And what information did your informant provide you

1    with in the spring of 2009 that brought Mr. Gardner to your

2    attention?

3    A    That he -- he knew Mr. Gardner, was aware of him, and

4    that Mr. Gardner had offered to sell him crack cocaine.

5    Q    Okay.  So the informant said that Mr. Gardner offered

6    to sell him crack cocaine?

7    A    Yes.

8    Q    All right.  And so the informant told you that in the

9    spring of 2009.

10   A    Yes.

11   Q    And did, to your knowledge, Mr. Gardner ever sell crack

12   cocaine?

13   A    Yes.

14   Q    And when was that?

15   A    I can't remember off the top of my head the exact date,

16   sir.  It was within the same week we asked the informant for

17   information to help us identify Mr. Gardner, who, at the

18   time, as I said, was known to us only as Blade.  We gathered

19   the information.  We did the typical thing that we do were

20   query databases and do other things prior to doing any kind

21   of controlled purchase.  We do as much homework as we can to

22   fully identify somebody.  So we identified the person that

23   we believed to be Blade, who was Delbert Gardner, who

24   provided a photograph to the informant without any

25   indications or markings of who that person was, and asked

1   the informant to identify who that person was.  The

2   informant was able to say yes, that's the Blade that I know.

3   We then instructed the informant to set up a controlled

4   purchase.  The controlled purchase took place with -- we had

5   electronic video surveillance, which was real time.  We also

6   had surveillance on the street.  So we observed Mr. Gardner

7   arrive at the location where we had set up this deal.  We

8   watched in real time as Mr. Gardner went in to our location,

9   met with our informants, received money from our informant.

10  Went back outside.  As I said, we had surveillance outside.

11  Met with an unknown third party, go back inside, and then

12  provide our informant with -- you know, what was suspected

13  at the time to be crack cocaine, which we later did forensic

14  tests which proved to be crack cocaine.

15  Q    How much?

16  A    It was approximately half an ounce.

17  Q    So about what, 14-and-a-half grams or so?

18  A    Somewhere in the neighborhood of 14 grams, yes.

19  Q    All right.  So it appeared -- were you watching the

20  surveillance?

21  A    I was.

22  Q    All right.  So you saw Mr. Gardner actually meet with

23  your informant.

24  A    Yes.

25  Q    And the informant handed him money.

23

1    A    Yes.

2    Q    And this is on a recording?

3    A    Yes, it is.

4    Q    All right.  And is it easy to see it?

5    A    Very easy.

6    Q    Okay.  And then Mr. Gardner went outside with the money

7    and met with another individual.

8    A    Yes.

9    Q    And then did you see him give money to the other

10   individual?

11   A    He -- his meeting with the other individual took

12   place inside of a vehicle, so we didn't see, you know, what

13   their exchange was.  We saw him get into the vehicle.

14   Well, he told -- he told our informant that he had to go

15   outside and get with his guy.  Go outside, get in this

16   vehicle, the vehicle didn't go anywhere, come back in, and

17   then provide to the CI.

18   Q    Okay.  So he -- it looked to you as though he, let's

19   say, middlemanned this transaction where he apparently got

20   the 14 grams or so of crack from this third person in the

21   car, brought it in in response to being given money by the

22   informant, gave it to the informant?

23   A    Yeah.

24   Q    Did you conduct any searches of any residences or

25   vehicles associated with Mr. Gardner?

1    A    No, sir, we did not.

2    Q    Other than this transaction, is there any other

3    surveillance of Mr. Gardner in the case?

4    A    We did not conduct any proactive surveillance of Mr.

5    Gardner.

6    Q    Other than this one incident in the spring/summer of

7    2009, was there ever any interception of any other

8    conversation of Mr. Gardener, either on a wiretap or

9    otherwise?

10        MR. TILL: Your Honor, I object to that question,

11    it's improper.  He's trying to find out about wiretaps.

12    That's completely improper.

13        THE COURT: Sustained.  This is a detention

14    hearing.  Now, if your goal was to convince me that the

15    evidence was not strong against Mr. Gardner, I think you're

16    failing in that because there's a controlled purchase.  So

17    I suggest you move on to a detention kind of thing.

18        MR. JURDEM: All right.

19    Q    (By Mr. Jurdem) Do you -- where I was going with that

20    is during this transaction was there any suggestion that Mr.

21    Gardner had a weapon?

22    A    No.

23    Q    During any of the -- and this is why I was asking about

24    other surveillance or interceptions, was there ever any

25    indication that Mr. Gardner had a weapon?

1    A    No, we did not ever have any specific information about

2    him possessing a weapon.

3    Q    All right.  Was -- I noticed another individual was

4    referred to by yourself as an enforcer, did -- was Mr.

5    Gardner known to anybody to be a violent or dangerous

6    person?  Was that relayed to you by anybody as -- as he has

7    this tendency?

8    A    If you're asking was it specifically said to me, no,

9    but I have no specific information whether or not he's

10   violent or not.

11   Q    Right.  But nobody told you this is a -- this is the

12   enforcer, this -- this guy carries a gun, this guy hurts

13   people, anything like that?

14   A    No.

15   Q    Now, after this transaction in June of 2009, when was

16   the next contact you had concerning Mr. Gardner?

17   A    We didn't -- we did not specifically target or attempt

18   to do anything else with Mr. Gardner since that time.

19   Q    So from June of 2009 until January of 2012, you had no

20   contact with Mr. Gardner?

21   A    No.

22   Q    And then how did you determine where Mr. Gardner was

23   when you wanted to arrest him?

24   A    Well, he actually maintained the same phone number that

25   he had at the time.  And so we -- we looked him up through

1   that and were able to -- that was able to help us identify

2   where he was.

3   Q    All right.  So back in June of 2009 when he was doing

4   this 14-gram transaction with the informant, he -- his phone

5   number was known?

6   A    Was known to our informant.

7   Q    Yeah.  And so when you went to arrest him in January

8   of 2012, you were able to use that phone number?

9   A    Yes.

10  Q    And what were the circumstances of the arrest?

11  A    I can't speak to that, I wasn't there.

12  Q    All right.  Did you receive any information that he

13  attempted to flee?

14  A    The only information that I received was that he had

15  been arrested.

16  Q    All right.  So you didn't receive any information to

17  suggest he resisted or otherwise tried to obstruct the

18  process of his arrest?

19  A    No.

20  Q    Do you know anything else about Mr. Gardner, other

21  than what we've discussed here?  Because I don't want to

22  waste the judge's time.

23  A    No, other than -- than what was said on the recording

24  where he described that he had provided a sample of the

25  crack cocaine that was sold to our informant, that he had

1    provided a sample of that to one of his best crackheads who

2    doesn't ever lie to him and told him that it was very good,

3    which indicated to us that he has a pattern of behavior in

4    trafficking cocaine or crack cocaine.

5    Q    But whether he does or he doesn't, you didn't attempt

6    to conduct any more purchases from him?

7    A    No, sir.

8    Q    Okay.  And you never -- apparently it was easy enough

9    to -- I don't even mean to make an assumption.  Apparently

10    you were able to locate him when you wanted to.  Did you

11    locate him in a residence, a car, or what?

12    A    Sir, I have no idea.  As I said, I didn't participate

13    in the arrest of Mr. Gardner.  We -- we had assistance from

14    other law enforcement agencies, and they took control of his

15    arrest.  I was not present, I did participate, I was just

16    told after the fact that he had been arrested, so I can't

17    speak to any circumstances about it.

18    Q    All right.  But at the time of his arrest, he was not

19    in possession of any weapons or any drugs or any indicia of

20    dealing drugs?

21    A    Sir, I honestly, I have no idea.  I'm sorry.

22    Q    I mean, if he had a large amount of drugs or weapons,

23    you would probably know that, wouldn't you?

24    A    Well, you know, the circumstances for any arrest could

25    be wildly different.  He could have been arrested in a car

1    and a search could have been done of his car, but I don't

2    know that it was.  He could have been arrested outside of

3    his car and no search was conducted of his car.  I have no

4    idea.  I can't speak to anything.  I do know that as far as

5    I know nothing was found on his person at the time of his

6    arrest, but I can't speak to any -- any other circumstances.

7    I'm sorry.

8    Q    Yes, but I mean if you had probable cause and you had

9    a way to locate him, you could have searched the area where

10   he was residing or the vehicle which he was using if you

11   had a reason to believe that there were any weapons or drugs

12   there or anything like that, right?   It's something you

13   could have done?

14   A    I honestly don't know.  As you know, every -- every

15   circumstance is different.  Those types of probable cause

16   and reasonable suspicion and all those things are dictated

17   specifically by each individual case.  Since I don't know

18   anything about the specific incident and how it took place,

19   I can't speak to what -- what they could have done or should

20   have done, or any of those things.

21             MR. JURDEM: Just one moment.

22             I don't have any further questions.

23             THE COURT: Okay.  Cross-examination.

24             MR. TILL: Your Honor, I have no questions.

25             THE COURT: All right.  May the witness be excused?

1          MR. JURDEM: Yes.

2          THE COURT:  All right, you're excused sir.

3          All right, Mr. Jurdem, any other witnesses?

4          MR. JURDEM: No, Your Honor.

5          THE COURT: All right, since you started with the

6    argument, I'm going to let you go ahead and go first and

7    finish up of anything that came from the witness's testimony

8    as well.

9          MR. JURDEM: Thank you, Your Honor.

10          Really --  I understand what the Court meant when

11    it said if I was seeking to show they had no evidence

12    against him I was failing in terms of one 14-gram sale which

13    he middle-manned in June of 2009.

14          MR. TILL: I would just like to interrupt in case

15    it's important to counsel.  Actually, my proffer would be

16    that the net weight -- and often when agents get something

17    and they're weighing it, they're (inaudible).   The net

18    weight was approximately seven grams of crack.

19          THE COURT: All right.

20          MR. JURDEM: That's an officer of the court.  Thank

21    you, Mr. Till, I appreciate that.

22          A quarter of an ounce, I guess, approximately, of

23    crack in June of 2009.  There appears to be evidence that he

24    middlemanned that transaction; however, I think when the

25    Court here is looking at the big picture of whether or not

1    he is a flight risk or dangerous, I respectfully suggest

2    that I may have given you some evidence that cause you to

3    believe that he is neither, because this occurs allegedly in

4    June of 2009.  When they want to find him, they use the

5    phone number almost three years later that he had at the

6    time, and they're able to easily track him down.  With no

7    evidence of any attempt to flee or obstruct or otherwise

8    prevent his own arrest.  With no evidence of criminality

9    seized from him at the time of his arrest.  He is clearly

10   not part of this group of 16.  I think that as far as Count

11   5, certainly you have direct evidence that he was involved

12   in a transaction of seven grams.  As far as Count 32, I

13   think there's very little, if any, evidence that he ever

14   used these premises.

15        So what you have is somebody who you have evidence

16   that three years ago he was involved in a seven-gram sale of

17   crack, and the question then before the Court is whether or

18   not there is any way to keep the community safe and to keep

19   him from fleeing short of keeping him in custody without

20   bond.  And I believe that the resources of this Court are

21   sufficient to do that without adding him to the role of the

22   detention facility and holding him without bond.  I would

23   suggest that the Court seriously consider electronic home

24   monitoring as one possible way if the Court feels that

25   that's necessary.

1              He -- there is an interesting -- in item number

2        four of the report it suggests that he committed the instant

3        offense while on probation which -- on a misdemeanor.  He's

4        never been convicted of a felony.  I mean, he's 31 years old

5        and has no felonies, and given the nature of things we see

6        in this court, I think that the fact that he has no felonies

7        is significant for the Court's determination.  He was not on

8        probation in 2009, as far as I can tell, when this occurred.

9        He was eventually on probation on a misdemeanor and, as I

10       understand, that he's being supervised on that misdemeanor

11       probation.  But I just respectfully suggest to the Court

12       that you don't need to put him in custody three years after

13       he middlemanned a seven-gram transaction of crack without

14       bond, that there are other ways that we can exercise the

15       power of the Court to assure he is going to be here.  I

16       agree, he's had FTAs on things like traffic tickets and

17       things like that in his 31 years, but he's never absconded.

18       He could never, in his wildest dreams, figure out how to

19       evade the scope and power of the United States government to

20       track him down were he so inclined to flee, but he's

21       certainly not.  He's not a danger to anybody.  He had no

22       guns, no nothing like that.  So I'd ask the Court not to

23       hold him in custody.

24              I know from my experience, so I hate to bring this

25       up, I know that judges don't usually like when you bring up

1  the fact that, well, so-and-so was let out on a bond and so-
2  and-so else was let out on a bond, so you have to do the
3  same thing here.

4       THE COURT: That isn't going to work with me, so
5  you can save your breath.

6       MR. JURDEM: I didn't think so.  Yes, I --

7       THE COURT: I think each person is on his own, and
8  I don't -- I wasn't present for any of the other detention
9  hearings.

10       MR. JURDEM: Okay.

11       THE COURT: This is the first one that I've had on
12  this case --

13       MR. JURDEM: Okay.

14       THE COURT: -- so I don't care what they do.

15       MR. JURDEM: Okay.  All right.  Well, then I won't
16  tell you other than to say look at the people on this
17  Indictment and what their involvement is, and I think you
18  would have to conclude that my client's involvement is far,
19  far less and categorically different than at least 13 of the
20  16 people charged.

21       Thank you, Your Honor.

22       THE COURT: All right.  Before you leave the
23  podium, let me just ask you.  It looks like -- let's see, my
24  pages aren't numbered, I don't think, but Mr. Gardener was
25  -- pled guilty to assault on 10-26 of 2008, and he was

1  sentenced to 91 days in jail with 90 days suspended and a

2  year of supervised probation.  So that would appear to me

3  that he was on probation at the time, because on 7-28-09

4  there was a motion to revoke his probation which was filed.

5  So then there was a -- looks like they dealt with that

6  probation violation in September of 2009, so I think on that

7  case he was on probation.

8         MR. JURDEM: So he -- on the general sessions -- is

9  that a Denver General Sessions ticket?

10        THE COURT: Yes, the 08GS087785, it's a misdemeanor

11  assault.

12        MR. JURDEM: All right.  Yeah, and I was -- yeah,

13  the Court's right.  I was unclear as to -- I guess I was

14  assuming the allegation was that he was on probation in the

15  2010-cr-98 case.  But in terms of the General Sessions,

16  that's a municipal ordinance violation, that doesn't make it

17  okay, but its categorically different than this.  I don't

18  know if it was a fight, or what it was.

19        THE COURT: Right.  But I just wanted to make sure

20  that I wasn't misunderstanding you.  You're --

21        MR. JURDEM: No, the Court's right.

22        THE COURT: -- not contesting.  He was on

23  probation.

24        MR. JURDEM: You're right.

25        THE COURT: Okay.

1          MR. JURDEM: You're right.

2          THE COURT: Since that's one of the factors I need
3     to consider.

4          MR. JURDEM: Okay.

5          THE COURT: All right. But not on the 2010, because
6     obviously this happened in 2009.

7          MR. JURDEM: Right.

8          THE COURT: All right.

9          Mr. Till, we're a little out of order, so any
10    proffers that you want to make is all right since I didn't
11    really give you a chance to do that, so you can do that
12    along with your argument if you'd like.

13         MR. TILL: Your Honor, the proffer would be very
14    limited.  I would indicate to counsel and to the Court, my
15    understanding is that the clubhouse location was used upon
16    occasion for parties involving outside -- members outside,
17    to mean members of the club and outsiders go, also known as
18    civilians, and some of these parties involved entertainment,
19    and  sometimes  the  parties  involve  music,  and  my
20    understanding -- and this is actually consistent with the
21    Pretrial  Services  Report  and  the  defendant's  purported
22    employment at times as a musician, is that the defendant was
23    involved on the entertainment side at the clubhouse and --
24    and basically our understanding of what happened in the
25    clubhouse, Your Honor, based on debriefing, a number of

1    people come as informants, there also was an undercover

2    agent who was in there upon occasion, is that chronically

3    there was the use of drugs at the clubhouse, marijuana and

4    cocaine.  And several people, including the defendant, are

5    believed to be sources of cocaine that was brought into the

6    clubhouse to be used upon occasion. And, in fact, the person

7    who -- worked with the Alcohol, Tobacco and Firearms

8    investigators to do the controlled purchase was videotaped

9    basically, that would have been a member of the club that

10   the defendant knew based on his contact with the club.

11        But in any event, Your Honor, the more serious

12   offense here for him probably is the videotaped purchase.

13   And his record is such that he has not done well on

14   probation, he has not done well under probation supervision.

15   He's been revoked and continued a number of times.  He's

16   still on probation in one case.  He has a number of failures

17   to appear.  In a way, he's lucky.  I believe in 2009, if he

18   had been brought in at that time, I could have my dates

19   wrong, but I think at that time it was still basically five

20   grams of crack cocaine for five years.  And so, in a sense,

21   he benefits from the delay.  He's not necessarily looking at

22   a mandatary minimum sentence at this time.  But it's still

23   very serious, and in light of his situation in the world,

24   apparently he has very, very sketchy employment.  I would

25   submit to the Court that he simply does not have the record

1    that would support releasing him on bond at this time, and

2    we do ask the Court to retain without bond, Your Honor.

3              THE COURT: All right.  I believe this is a case in

4    which the rebuttable presumption favoring detention without

5    bond is applicable.  Essentially, that presumption is under

6    18, 3142(e) and (f).  I believe that it -- this is a case

7    that falls under that because of the Count 5 charge of Title

8    21, United States Code, Section 841(a)(1) and (b)(1)©,

9    carrying a term of imprisonment of up to 20 years, any

10   controlled substance offense that has a ten-year cap or more

11   comes under the presumption.

12             Now, as we all know, the presumption can be

13   rebutted by evidence -- some evidence.  And it doesn't have

14   to be a lot of evidence, but there does need to be some

15   evidence to rebut the presumption.  The evidence that I've

16   received in this case is primarily from the Pretrial

17   Services Report, which both counsel have copies of, and

18   we've discussed somewhat at this time, and then also the

19   testimony of Special Agent Cole.  And so looking at, first

20   of all, the Bail Reform Act and what I need to consider, I

21   I don't see any real evidence that the defendant has

22   rebutted the presumption of favoring detention.  He doesn't

23   seem to have a lot of family in Colorado, they are out of

24   state, some of which he keeps in contact with and some he

25   doesn't.  He was -- his primary contacts, family contacts

1    are in Tulsa, Oklahoma.  So he doesn't have substantial ties
2    with the community that I can see, other than perhaps the
3    ties that are -- would not be so good as far as this case
4    and the Indictment goes.  He doesn't have stable employment.
5    He's listed some employment, it looks like with Labor Ready
6    and Anointed Word of Truth Tabernacle, very little income
7    from that.  The Colorado Department of Labor didn't reflect
8    any employment records.  Now, that's only Colorado earnings,
9    but, again, that's ties to the community.

10          So I don't believe that there's been evidence here
11   that he -- that he's rebutted the presumption, so in the
12   first place I'm going to find that he has not rebutted the
13   presumption.  However, looking on to the Bail Reform Act, I
14   don't think looking at the factors, even if he had rebutted
15   the presumption, the presumption is an element that still
16   must be considered, and looking at all the other elements
17   that I have to consider, he doesn't fare very well.  The
18   nature and circumstances of the offense charge, this is a
19   drug case, and that's the charge against him.  As the
20   prosecution said, he does not face the minimum mandatory in
21   this case, but it's still a significant amount of time that
22   he could get.

23          The weight of the evidence, at least on Count 5,
24   as I said, I think is pretty weighty.  I mean, there's a
25   videotape transaction.  So I won't comment too much about

1    the clubhouse.  That, to me -- I haven't heard all the

2    evidence, that doesn't seem particularly strong, but Count

3    5 does.

4           The history and characteristics of the person, I

5    agree that it is good that he doesn't have any felonies,

6    although I don't -- somehow can't jump up and down about a

7    man his age not having any felonies.  He has a number of

8    misdemeanors.  He was on probation at the time the offense

9    was committed.  His probation has been revoked on at least

10    two of his misdemeanor or petty offense kind of convictions.

11    He has a drug conviction petty offense, it's not a felony,

12    and he has six failures to appear and one failure to comply.

13    So coupled with his lack of employment, I don't think that

14    goes very well to the history and characteristics of the

15    person and the nature and seriousness of danger to any

16    person.

17           He did not -- there is no evidence at all that he

18    has anything to do with weapons.  But the problem is that

19    selling drugs is a danger in itself and it's a danger to the

20    community, and I think the evidence on that is strong.  So

21    at this time I am going to find that there are no conditions

22    or combination of conditions that could be imposed in

23    connection with pretrial release that would reasonably

24    assure the appearance of the defendant or the safety of the

25    community, and I am going to detain him without bond pending

1    further proceedings.

2                Anything further from the government?

3                MR. TILL: No, Your Honor.

4                THE COURT: Mr. Jurdem?

5                MR. JURDEM: No, Your Honor.

6                THE COURT: All right.  So is there anything else

7    we need to take up today?  I think we've touched on

8    everything that was set.

9                MR. TILL: Did he plead not guilty, Your Honor?

10               THE COURT: Yes.

11               MR. TILL: Okay.

12               MR. JURDEM: Yes.

13               THE COURT: Yes.

14               MR. JURDEM: He did.

15               THE COURT: And the not guilty pleas are entered.

16               All right, we'll be in recess on that case then.

17               (Whereupon, the within hearing was then in

18   conclusion at 3:11 p.m. on January 31, 2012.)

19

20               I certify that the foregoing is a correct

21   transcript, to the best of my knowledge and belief, from the

22   record of proceedings in the above-entitled matter.

23

24        /s/ Bonnie Nikolas                 April 04, 2012

25        Signature of Transcriber                  Date


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

40

1                       ** WITNESS INDEX **

2                                                     PAGE

3       Special Agent Jason Cole

4       Direct Examination by Mr. Jurdem                7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25